United States District Court
Southern District of Texas
**ENTERED**
September 03, 2021
Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| LNY 5003 LLC, | § | CIVIL ACTION NO. |
| Plaintiff, | § | 4:20-cv-02992 |
| | § | |
| | § | |
| vs. | § | JUDGE CHARLES ESKRIDGE |
| | § | |
| | § | |
| ZURICH AMERICAN | § | |
| INSURANCE | § | |
| COMPANY, | § | |
| Defendant. | § | |

## OPINION AND ORDER
## DENYING MOTION TO REMAND

The motion by Plaintiff LNY 5003, LLC to remand this action to Texas state court is denied. Dkt 11. The motion by Defendant Zurich American Insurance Company to conduct jurisdictional discovery is denied as moot. Dkt 18.

### 1. Background

The caption in this action suggests that it's a coverage dispute between a company and its insurance carrier. But LNY is actually a recently created and relatively minor entity nestled within a vast, complex corporate structure atop which sits Fertitta Entertainment, Inc and Fertitta Hospitality, LLC. These two Fertitta entities are the actual insureds under the subject policy. LNY proceeds here by a putative assignment from them that purportedly allows this coverage dispute with Zurich to be litigated *in state court* what diversity jurisdiction would otherwise require the Fertitta entities to litigate *in federal court*.

LNY, as the party at the top of the caption, has citizenship in Texas and Illinois. Dkt 1-2 at ¶ 2. But to understand why that is so requires a bit of explanation.

Tilman J. Fertitta is a global leader in the dining, hospitality, entertainment, and gaming industries. From Houston, he's the sole shareholder, chairman, and chief executive officer of Fertitta Entertainment, Inc, which is a Texas corporation with its principal place of business in Texas. Dkt 1 at 2; Dkt 14-1 at 149, 164. Mr Fertitta is also the president of Fertitta Hospitality, LLC, a Texas limited liability corporation. For purposes of federal diversity jurisdiction, an LLC is a citizen of the state where it's organized or of the states of which its members are citizens. *Harvey v Grey Wolf Drilling Co*, 542 F3d 1077, 1078 (5th Cir 2008). The record in that regard establishes that, in addition to Mr Fertitta, the directors of Fertitta Hospitality include Paige Fertitta (his former wife) and an individual named Kelly Roberts, all of whom appear to be Texas residents. Dkt 1-9 (2018 franchise tax public information report).

Fertitta Entertainment is also the parent company of (among many other entities) the Houston Rockets, Landry's Inc, the Golden Nugget Casinos, and—important here—the steakhouse chain of Morton's of Chicago, Inc. Dkt 14-1 at 164; Dkt 11-3 at ¶ 3. Morton's is an Illinois corporation with its principal place of business in Texas. Dkt 11-3 at ¶ 3. Also somewhere else below Fertitta Entertainment is LNY, a Texas LLC formed in February 2020. Dkt 14-1 at 173. And Morton's is the sole member of LNY, which thus also gives LNY Illinois citizenship. Dkt 1-2 at ¶ 2.

Zurich, as the party at the bottom of the caption, can be understood in a much more transparent and straightforward manner. It's a New York corporation with its principal place of business in Illinois. Dkt 1-2 at ¶ 3.

Behind the caption is an international insurance-coverage dispute arising from the COVID-19 pandemic. Zurich issued an insurance policy to Fertitta Entertainment and Fertitta Hospitality with an effective date from May 2019 through May 2020. Dkt 14-1 at 11, 149 (insurance policy). The policy covered seventeen restaurants, most of which are owned by Morton's. Of the covered restaurants, seven are in Canada, three are in China, three are in Hong Kong, and one is in each of

Taiwan, Macau, Singapore, and Mexico. Dkt 11-2 at 4. The policy admonishes the Fertitta enterprises in relevant part that:

> Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured.

Dkt 14-1 at 42.

LNY observes in its briefing, "In late 2019, the COVID-19 virus was first identified in Wuhan, China and subsequently spread across the globe." Dkt 19 at 3. All are well aware of the extreme, global slowdown in business that came with reaction to the COVID-19 pandemic in March 2020. Restaurants were surely among the hardest hit industries, with many experiencing an abrupt stoppage that lasted for months. Given their operations in Asia (and China in particular), Fertitta Entertainment and Fertitta Hospitality appear to have anticipated those potential consequences even before reaction reached its onerous, global scale. And so, LNY was formed as a Texas LLC in February 2020 as noted above.

The seventeen restaurants insured under the pertinent policy then suffered business-interruption losses due to pandemic-related shutdowns. Fertitta Entertainment submitted claims under the policy to Zurich in April 2020. Dkt 11 at 2; Dkt 14 at 8. Zurich denied those claims at some point later that month or the next. Dkt 11 at 2.

Fertitta Entertainment and Fertitta Hospitality purported to assign their claims under the policy to LNY on July 6, 2020 for the nominal sum of ten dollars. Dkt 11-1 at 1. The at-issue assignment was executed by Steven L. Scheinthal on behalf of the Fertitta entities and by Richard H. Liem on behalf of LNY. Id at 3. Scheinthal is an executive vice president and the general counsel of Fertitta Entertainment, as well as the vice president and secretary of Fertitta Hospitality. Dkt 14-1 at 164–65; Dkt 11-2 at 3. But he's also the managing member of LNY. Dkt 1-10. Liem is the vice president and managing member of Morton's (who, it must be remembered, is in turn the sole member of LNY). Dkt 11-2 at 1, 3. But he's also an executive vice president

and the chief financial officer of Fertitta Entertainment. Dkt 14-1 at 164.

In other words, this was no arm's-length assignment for value. The signatories of both Fertitta Entertainment and Fertitta Hospitality (as the assignors) and LNY (as the assignee) were each *directly* affiliated with each other. And LNY affirmed at hearing that Fertitta Entertainment is the "ultimate parent" of and retained a financial interest in LNY. Dkt 22 at 38.

Eighteen days after the putative assignment, LNY brought action against Zurich in Texas state court for breach of contract, breach of the duty of good faith and fair dealing, and violations of the Texas Insurance Code. LNY's complaint makes clear that it asserts claims on its own behalf. For instance, it alleges:

> An actual and genuine justiciable controversy presently exists between Plaintiff and Zurich that justifies a declaration regarding *the parties' rights and obligations under the Policy*.

> In particular, Plaintiff seeks a declaration that the Policy covers *Plaintiff's claims* for direct physical loss of or damage to real property arising out of the public's fear of the coronavirus, the various governmental shut-down orders, the coronavirus itself, or some or all of these factors combined together.

Dkt 1-2 at ¶¶ 14–15 (emphasis added). Although unable to provide an exact figure at hearing, counsel for LNY asserted that "multi-millions" in damages are here at stake. Dkt 22 at 39.

Zurich answered the petition in August 2020 and amended its answer two days later. Dkts 1-4, 1-5. It raises several affirmative defenses, primarily arguing that LNY doesn't have standing to bring the claims at issue because it isn't insured under the policy. Dkt 1-5 at ¶ 1.

Zurich also promptly removed the action, asserting diversity jurisdiction under 28 USC §§ 1332 and 1441. Dkt 1 at ¶ 8. LNY moved to remand, arguing that diversity doesn't exist between it and Zurich because they're both citizens of Illinois. Dkt 11 at 1.

4

The Court heard argument at hearing in December 2020. Dkt 22. The parties were allowed supplemental filings based on arguments and cases discussed at hearing. Dkts 24–26.

2. Legal standard

Article III, § 2 of the United States Constitution vests federal courts with jurisdiction over controversies between "Citizens of different States." This is given statutory effect by 28 USC § 1332(a)(1). Where a plaintiff elects to sue a defendant in state court even though "original jurisdiction" also exists in federal court, 28 USC § 1441(a) permits that defendant to remove the action from state court. But the action must be remanded under 28 USC § 1447(c) if "at any time before final judgment it appears that the district court lacks subject matter jurisdiction."

The removing party "has the burden of proving by a preponderance of the evidence that subject matter jurisdiction exists." *New Orleans & Gulf Coast Railway Co v Barrois*, 533 F3d 321, 327 (5th Cir 2008) (citations omitted); see also Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* § 43 (West 2d ed April 2019 update). This is no easy lift. The removal statute is strictly construed in favor of remand. *Manguno v Prudential Property & Casualty Insurance*, 276 F3d 720, 723 (5th Cir 2002). And a presumption exists against subject matter jurisdiction, which "must be rebutted by the party bringing an action to federal court." *Coury v Prot*, 85 F3d 244, 248 (5th Cir 1996) (citation omitted). The Fifth Circuit holds that any "doubts regarding whether removal jurisdiction is proper should be resolved against federal jurisdiction." *Acuna v Brown & Root, Inc*, 200 F3d 335, 339 (5th Cir 2000).

The existence of federal subject matter jurisdiction is determined at the time of removal. See *In re Bissonnet Investments LLC*, 320 F3d 520, 525 (5th Cir 2003), citing *Arnold v Garlock*, 278 F3d 426 434 (5th Cir 2002). This includes consideration of "the claims in the state court petition as they existed at the time of removal." *Manguno*, 276 F3d at 723 (citation omitted).

With respect to diversity jurisdiction, the Supreme Court holds that "the citizens upon whose diversity a plaintiff grounds jurisdiction must be real and substantial parties to the controversy." *Navarro Savings Association v Lee*, 446 US 458, 460

(1980) (quotations omitted) (collecting cases). Indeed, federal courts "must disregard nominal or formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy." Ibid (citations omitted).

It's an "old and recurring song" that local plaintiffs favor local courts, while foreign defendants try to avoid them. *Smallwood v Illinois Central Railroad Co*, 385 F3d 568, 576 (5th Cir 2004, *en banc*). But federal courts "may and should take such action as will defeat attempts to wrongfully deprive parties entitled to sue in the Federal courts of the protection of their rights in those tribunals." *Alabama Great Southern Railway Co v Thompson*, 200 US 206, 218 (1906); see also *Wecker v National Enameling & Stamping Co*, 204 US 176, 186 (1907). It's therefore "well-settled that the district court will not allow removal to be defeated by . . . a merely apparent assignment of claims." Wright & Miller, *Federal Practice and Procedure*, § 3723.1. Other federal courts are in accord. For example, see *Attorneys Trust v Videotape Computer Products*, 93 F3d 593, 596–99 (9th Cir 1996) (collecting cases); see also *Nukote of Illinois, Inc v Clover Holdings, Inc*, 2011 WL 13290667, *9 (ND Tex).

### 3.  Analysis

Did the at-issue assignment from the Fertitta entities to LNY destroy the diversity jurisdiction that otherwise exists between the Fertitta entities and Zurich?

### a.  Ability to identify the real parties in interest

LNY argues that precedent leaves this Court entirely without power even to entertain the above question, which would inquire into the basis of an allegedly complete assignment. Dkt 11 at 3–8. The Supreme Court has essentially defined *complete assignments* as those "where the transfer of a claim is absolute, with the transferor retaining no interest in the subject matter." *Kramer v Caribbean Mills, Inc*, 394 US 823, 828 n 9 (1969) (citations omitted). But the claims at issue here derive from a contractual relationship (being the subject insurance policy) that expressly addressed assignments. Whether the assignment is *complete* thus depends upon whether the assignment is itself *valid* under that contract. Because if invalid, the assignment didn't actually happen at all—much less in the sense of being *complete*.

LNY cites cases tracing to *Provident Savings Life Assurance Society of New York v Ford*, 114 US 635 (1885). An individual judgment creditor (Charles Cochran, a resident of Ohio) there assigned 100% of his interest in a judgment against Provident (a New York corporation) to the plaintiff (Daniel Ford, a citizen of New York). The assignee/plaintiff then sought to collect the judgment in New York state court—diversity having been destroyed. 114 US 635, 636–37 (1885). Provident removed the matter, arguing in part that diversity jurisdiction existed because the assignment was fraudulent, with the result being that the original, non-diverse judgment creditor remained the real party in interest. Id at 637, 640. The Supreme Court disagreed, stating at considerable length:

> The plain answer to this position is, that the action was nevertheless Ford's, and as against him there was no right of removal. If he was a mere tool of Cochran, and if the latter was the person really interested in the cause, the action could not have been sustained; for the Code of Procedure of New York declares, that every action must be prosecuted in the name of the real party in interest, except in a few cases not including this. And not alone in New York, but anywhere, if it could be shown that the assignment was fraudulent as against the defendant, it would be void, and this fact would be a defence to the action brought by the assignee. We know of no instance where the want of consideration in a transfer, or a colorable transfer of a right of action from a person against whom the defendant would have a right of removal to a person against whom he would not have such a right, has been held a good ground for removing a cause from a State to a federal court. Where an assignment of a cause of action is colorably made for the purpose of giving jurisdiction to the United States court, § 5 of the act of Congress of March 3, 1875, relating to removals, has now

> given to the Circuit Courts power to dismiss or
> remand the cause at any time when the fact is
> made to appear. And by analogy to this law, it
> may, perhaps, be a good defence to an action in
> a State court, to show that a colorable
> assignment has been made to deprive the
> United States court of jurisdiction; but, as
> before said, it would be a defence to the action,
> and not a ground of removing that cause into
> the federal court.

Id at 640–41 (internal quotations omitted).

More succinctly, the Fifth Circuit observed that *Provident* and its progeny establish two propositions "where assignments of a complete cause are concerned." *Grassi v Ciba-Geigy, Ltd*, 894 F2d 181, 183 (5th Cir 1990). *First,* "federal courts lack the power to look beyond the pleadings in determining the existence of diversity jurisdiction absent specific statutory authorization." Ibid. *Second,* "state law and the state court systems will adequately defend a defendant's right to removal jurisdiction against devices designed to defeat it." Ibid.

It's questionable whether *Provident* will remain good law if and whenever considered again by the Supreme Court. For instance, the Fifth Circuit in *Grassi* remarked, "Although the basic propositions for which *Provident* and its progeny stand have been abandoned, the Supreme Court has not had formal occasion to reexamine that ruling since 1887." 894 F2d at 184. In so saying, it referenced *Wecker v National Enamelling & Stamping, Co*, 204 US 176, 185–86 (1907), "which recognized that federal courts do possess some inherent authority to look beyond the pleadings in order to protect a litigant's right to diversity jurisdiction." 894 F2d at 183. And it cited *In the Matter of the State of Nebraska*, 209 US 436, 444–45 (1908), which held "the duty of the federal court" to be determination of the "actual party plaintiff . . . by consideration of the nature of the case presented by the whole record, and not simply by a reference to the nominal parties." 894 F2d at 183. The Ninth Circuit agreed that such doubts about the continued verity of *Provident* are "well-grounded." *Attorneys Trust v Videotape Computer Products*, 93 F3d 593, 599 (9th Cir 1996).

Still, *Provident* remains a binding pronouncement—at least as far as that decision goes. And indeed, the Fifth Circuit in *Grassi* strove to avoid the question of "whether the Supreme Court was incorrect" in its decision by limiting *Provident* to its facts and declining to extend it to the facts in *Grassi* of partial (as opposed to complete) assignment. 894 F2d at 184–85.

A similar approach is warranted here. The result required by *Provident* only obtains "where assignments of a complete cause are concerned." *Grassi*, 894 F2d at 183. But more precisely, it obtains where what's before the court is indisputably a complete assignment. That was the precise situation in *Provident*, where the completeness of the assignment of an enforceable judgment was readily determined on its face. Judgments aren't contracts and don't of their nature come with anti-assignment restrictions. This is what the Supreme Court meant when it said that "the action was nevertheless [the assignee/plaintiff's], and as against him there was no right of removal." 114 US at 640.

By contrast, Fertitta Entertainment and Fertitta Hospitality were in *contractual privity* with Zurich when it denied their claims and gave rise to the causes of action that LNY now purports to assert. That contractual relationship was (and is) subject to a valid anti-assignment clause. And that bargained-for, anti-assignment clause impacts the completeness of the putative assignment.

Understanding these factual differences properly respects the actual holding in *Provident*. The broader language quoted in full above (and upon which LNY emphasizes and relies) contains observations that move well beyond the facts of the underlying, as-assigned judgment at issue there. As such, the Supreme Court's own interpretive pronouncements mustn't be ignored. For example, as stated in *Cohens v Virginia* by Chief Justice John Marshall:

> It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. *If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision.* The reason of this maxim is obvious.

> The question actually before the Court is
> *investigated with care*, and *considered in its full extent*.
> Other principles which may serve to illustrate it,
> are considered in their relation to the case
> decided, but their possible bearing on all other
> cases is seldom completely investigated.

19 US 264, 399–400 (1821) (emphasis added). Or as more recently and succinctly stated, "[W]e are not bound to follow our dicta in a prior case in which the point now at issue was not fully debated." *Central Virginia Community College v Katz*, 546 US 356, 363 (2006) (citation omitted); see also *United States v Becton*, 632 F2d 1294, 1296 n 3 (5th Cir 1980) (citation omitted).

"Not all text within a judicial decision serves as precedent." Bryan A. Garner, et al, *The Law of Judicial Precedent* 44 (Thomson Reuters 2016). And *Provident* in no way addressed an anti-assignment provision in a contract that one party has disregarded to manipulate federal-court jurisdiction as against its counterparty to that contract. This means that LNY is here seeking a result ostensibly springing from *Provident*, but on facts which that case in no way touched or concerned—and so (in the words of Chief Justice Marshall) its argument was neither *investigated with care*, nor *considered in its full extent*. That's all well and good, were LNY here arguing that the result in *Provident* is sound and should be extended on its own merit to this present context. But it is quite another to argue that *Provident* is a blindfold preventing this Court from even considering whether and how it might apply in this situation. Indeed, to the extent that LNY's argument for following *Provident* "depends on radically reconceptualizing its reasoning, that argument is at odds with itself." *Citizens United v Federal Election Commission*, 558 US 310 at 384 (2010) (Roberts, CJ, concurring). That's because *stare decisis* "is a doctrine of preservation, not transformation." Ibid.

This action concerns a putative assignment that would *destroy*, rather than *create*, diversity jurisdiction. Were it simply the latter, federal statute would itself defeat LNY: "A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court." 28 USC

§ 1359. LNY points to this statute when arguing that the lack of a statutory directive running the other direction sanctions its tactic here. Dkt 25 at 1–2; Dkt 19 at 5–6. But a well-respected treatise on federal procedure flatly disagrees: "The absence of a statute comparable to the anti-collusion provision in Section 1359 of Title 28, although somewhat inhibiting, should not prevent completely the federal courts from protecting a litigant's statutory right to invoke diversity jurisdiction when the controversy really is between parties on one side who are completely diverse from those who are on the other side of the case." Wright & Miller, *Federal Practice and Procedure*, § 3641. Quite simply, courts "should not presume that every statute answers every question." Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 93 (West 2012). And a statute prohibiting common jurisdictional manipulation in one direction doesn't make a less-common jurisdictional manipulation in another direction permissible.

Beyond all this, the Fifth Circuit plainly holds, "Because of their similarity, assignments which destroy diversity and assignments which create diversity should be analyzed under the same standard." *Grassi*, 894 F2d at 186. Indeed, the Supreme Court instructs that the question posed at the outset must be answered precisely because subject matter jurisdiction is measured only by the identities of the real parties in interest. For example, see *Navarro*, 446 US at 460–61 (collecting authority). Indeed, the Supreme Court has long and forcefully held, "Federal courts should not sanction devices intended to prevent a removal to a Federal court where one has that right, and should be equally vigilant to protect the right to proceed in the Federal court as to permit the state courts, in proper cases, to retain their own jurisdiction." *Wecker*, 204 US at 186.

LNY touts a number of decisions that it argues warrant an opposite determination. But crucially, none appear to have involved claims arising out of a contractual relationship governed by an anti-assignment clause. See Dkt 15 at 5–6 and Dkt 19 at 7–8, citing *Amalgamated Gadget, LP v Mack*, 2004 WL 549483, *3 (ND Tex) (involving complete assignment of claims arising out of purchase of senior notes and alleged securities fraud); *Nepveux,*

11

*Inc v Mobil Exploration & Producing North America*, 2018 WL 4523953, *3 (WD La) (involving complete assignment to new corporation of ownership interest in real property and all claims related to contaminated land); *Gulf Hydrogen & Energy, Inc v Eastman Chemical Co*, 2013 WL 5945671, *3 (SD Tex), Civil Action No 13-00276, Dkt 1-1 (involving complete assignment of claims for breach of contract, fraud, fraud by nondisclosure, fraudulent inducement, and promissory estoppel upon change of corporate form from Texas LLC to Delaware corporation); *6200 GP, LLC v Multi Service Corp*, 2014 WL 12668504, *2 (ND Tex), 2018 WL 3154594, *1 (Tex App—Dallas, no pet) (on remand) (involving transfer of ownership between sole member entities of plaintiff LLC as to claims for breach of several memorandums of understanding involving development of a maritime fueling payment system and related software ); *Ivanhoe Leasing Corp v Texaco, Inc*, 791 F Supp 665, 666–68 (SD Tex 1992) (involving complete transfer of grantor's interest in real property as to claims for negligence, gross negligence, trespass, and nuisance).

Attention thus properly turns to answering the question posed at the outset.

    b.   Identifying the real parties in interest

The identity of the real parties in interest depends here upon the validity of the at-issue assignment. If that assignment was proper under the policy, diversity jurisdiction over the action fails because LNY and Zurich are both citizens of Illinois. But if it wasn't, complete diversity exists because the action is really between Zurich (a citizen of Illinois and Delaware) and Fertitta Entertainment and Fertitta Hospitality (citizens of Texas).

Zurich raises three arguments against validity. *First,* it asserts that the putative assignment is precluded by the policy's anti-assignment clause. Dkt 14 at 13–18. *Second,* it maintains that such purported assignment violates Texas law. Id at 18–19. *Third,* Zurich insists that LNY's citizenship should be disregarded under federal law because the at-issue assignment was "collusively or improperly made to avoid diversity jurisdiction." Id at 21–25. The latter two contentions needn't be directly addressed. Resolution of the first is dispositive, particularly in

12

view of typical standards on a motion to dismiss as to consideration of the complaint's well-pleaded facts.

The legal standards set out above dictate that what matters when assessing jurisdiction following removal are "the claims in the state court petition as they existed at the time of removal." *Manguno*, 276 F3d at 723 (citation omitted). And in that respect, LNY's petition proceeds on contention that it is pursuing its *own* claims as if it was *itself* insured under the policy. For instance, it insists that "the Policy is a valid and enforceable contract, *and the Plaintiff performed its obligations under that contract*," and that "Zurich breached its duty of good faith and fair dealing by failing to conduct an investigation *into Plaintiff's claims*." Dkt 1-2 at ¶¶ 16, 22 (emphasis added).

Such pleading presupposes that LNY—and not the Fertitta entities—has rights and duties under the policy that gave rise to its own claims. But that can't be so because the insurance policy flatly prohibits the transfer of "rights and duties." Dkt 14-1 at 42. A number of cases reject this type of purported assignment. See Dkt 14 at 13–17, citing, among others, *Texas Farmers Insurance Co v Gerdes*, 880 SW2d 215, 218 (Tex App—Fort Worth 1994, writ denied) (collecting cases); *Paramount Disaster Recovery, Inc v Axis Surplus Insurance Co*, 2011 WL 3875357, *3–4 (SD Tex); *Chul Ju Choi v Century Surety Co*, 2010 WL 3825405, *4–5 (SD Tex).

LNY in fact acknowledges that the anti-assignment clause bars the transfer of rights and duties as to coverage under the policy. Dkt 11 at 5–6, Dkt 22 at 7–8, 25. But it argues that this particular assignment isn't prohibited because it involved putative assignment of *causes of action*, whereas the anti-assignment clause only prohibits the assignment of *rights and duties*. It cites several cases that it says recognize such a distinction under Texas law. Dkt 11 at 5–6, citing, among others, *Elness Swenson Graham Architects, Inc v RLJ II-C Austin Air, LP*, 520 SW3d 145, 156 n 3 (Tex App—Austin 2017, pet denied); *Pagosa Oil & Gas, LLC v Marrs and Smith Partnership*, 323 SW3d 203, 211–12 (Tex App—El Paso, 2010, pet denied); *City of San Antonio v Valemas, Inc*, 2012 WL 2126932, *8 (Tex App—San Antonio, no pet); *City of Brownsville v AEP Texas Central Co*, 348 SW3d 348, 358 (Tex App—Dallas 2011, pet denied). Zurich disputes that any such

distinction exists, contending instead that it is nothing other than *rights and duties* that give rise to *causes of action.* Dkt 14 at 13–18.

The semantic difference—if any—between *rights and duties* and *causes of action* in the context of Texas insurance law needn't be resolved. For it's a distinction that depends upon LNY having proceeded here on the basis that it was actually assigned *causes of action.* To the contrary, LNY's live petition plainly asserts its own claims deriving from its own *rights and duties,* not mere *causes of action* of the Fertitta entities.

The holding of the Fifth Circuit in *Keller Foundations, Inc v Wausau Underwriters Insurance Co* is instructive. See 626 F3d 871 (5th Cir 2010). A purchase agreement there transferred nearly all assets of an insured to the plaintiff. An anti-assignment clause in the pertinent insurance policy barred the transfer of "rights and duties" of the insured. The plaintiff was later sued for harm arising from work done by the insured prior to the purchase and transfer. The insurance company refused to provide coverage, and the plaintiff brought action alleging breach of contract, violations of the Texas Insurance Code, and breach of the duty of good faith and fair dealing. Id at 872–73. The Fifth Circuit held that the assignment was barred by the policy's anti-assignment clause because, at base, the plaintiff was trying to obtain coverage under the policy. Id at 875. And it specifically observed that the plaintiffs couldn't "circumvent the non-assignment clause by casting the transfer of the insurance coverage as the transfer of a chose in action." Ibid (internal quotations omitted).

So, too, here. Fertitta Entertainment and Fertitta Hospitality entered into the putative assignment with LNY *after* their alleged harm arose upon the denial by Zurich of their submitted claims. See Dkt 14 at 8–11. And LNY seeks to distinguish its situation on assertion that it isn't seeking coverage for itself under the policy. Dkt 22 at 7–8, 10–11. While that's an interesting attempt to thread the eye of a very small needle, it still runs into the same problem—being that its petition takes the opposite position. For instance, in addition to what's already quoted above, LNY flatly avers:

> Zurich received notice of the facts related to *Plaintiff's claim* under the Policy. Zurich

14

> acknowledged receipt of the claim. *Plaintiff cooperated* with Zurich and furnished all information and items requested. Despite such cooperation, the fact that Zurich was or should have been aware that *Plaintiff's losses and damages* were covered by the policy, and the passage of more than 60 days from the time Zurich received all of the information requested to process *Plaintiff's claim*, Zurich denied the claim instead of paying it.

Dkt 1-2 at ¶ 20 (emphasis added). This position manifests itself even in the requested remedy, where LNY goes so far as to request "a declaration regarding *the parties' rights and obligations under the Policy*." Id at ¶ 14 (emphasis added).

LNY raised a further argument in reply, insisting that the at-issue assignment is valid *even if* it violates the terms of the policy. Dkt 15 at 1. Being raised for the first time in a reply brief, the argument is technically waived. See *Houser v LTD Financial Services LP*, 512 F Supp 3d 746, 751 (SD Tex 2021), citing *United States v Jackson*, 426 F3d 301, 304 n 2 (5th Cir 2005). Indeed, a motion by Zurich to surreply was denied as unnecessary because new arguments wouldn't be considered. Dkt 16; Minute Entry of 10/28/2020. Even so, both parties addressed the topic at hearing. As such, LNY was allowed to file a further three-page response so that the surreply could be fairly considered here. See Dkt 24; see also Dkt 22 at 14, 21–23.

LNY relies on a Texas Supreme Court decision for the proposition that "even if a contract itself 'was not validly assigned or assignable' that 'does not prevent a valid assignment' of a 'claim.'" Dkt 15 at 1, quoting *Dearborn Stove Co v Caples*, 236 SW2d 486, 490 (1951). But that's a quite incomplete understanding of the proposition for which *Dearborn* actually stands. A tenant there attempted to assign his prepaid residential lease to his former employer by writing on the back of the lease, "I hereby assign all of my rights in this lease to Dearborn Stove Co." *Caples v Dearborn Stove Co*, 231 SW2d 669, 673 (Tex Civ App—Dallas 1950), rev'd in part, aff'd in part, 236 SW2d 486 (Tex 1951). But the lease "was expressly nonassignable" without the landlord's consent and

consideration. 236 SW2d at 487. The landlord then occupied the residence for the remainder of the lease. 231 SW2d at 670. The assignee brought action, seeking damages for wrongful ouster, recovery of the unearned rent, and rent overcharges, along with treble damages and attorney fees pursuant to the Federal Emergency Price Control Act of 1942. Id at 671; 236 SW2d at 487–88. Two years later, the assignor formally assigned "any and all causes of action and claims which he *now* * * * possess against the [the landlord] and arising out of the transactions" to the assignee. 231 SW2d at 673 (emphasis and alterations in original).

The Texas Supreme Court thus had two assignments to consider. It first held that the lease itself couldn't be assigned according to its plain terms. 236 SW2d at 488–89. It also held that the overcharge claim under the federal statute was separately assignable. Id at 490 (citations omitted). But it further held that, even though the federal statue permitted recovery of treble damages and attorney fees, those aspects weren't assignable because "[r]ights of action of this type which do not survive death (whether death of the owner of the right or the party against whom the right lies) are considered nonassignable." Ibid (collecting cases).

This means that *Dearborn* actually weighs in favor of Zurich for several reasons. Of considerable weight here, the Texas Supreme Court obviously considered and gave effect to the contractual anti-assignment clause, holding that "the lease itself was not validly assigned or assignable." 236 SW2d at 490. The only claim that potentially survived despite that failed assignment was a *federal statutory claim* for "bare overcharges," which was already assignable under Texas law based on prior Texas Supreme Court precedent. Id at 490 (citation omitted).

To the contrary here, the only statutory claims asserted by LNY arise under the Texas Insurance Code. See Dkt 1-2 at ¶¶ 18–21. And claims for violations of the Texas Insurance Code are "not assignable under Texas law." *Montoya v State Farm Mutual Automobile Insurance Co*, 2017 WL 3726058, *4 (WD Tex), citing *PPG Industries, Inc v JMB/Houston Centers Partners Ltd*, 146 SW3d 79, 87 (Tex 2004), and *Great American Insurance Co v Federal Insurance Co*, 2006 WL 2263312, *10 (ND Tex); see also *American*

*Southern Insurance Co v Buckley*, 748 F Supp 2d 610, 626 (ED Tex 2010) (citation omitted). That's because such claims "are personal rather than property based." *Lee v Rogers Agency*, 517 SW3d 137, 166 (Tex App—Texarkana 2016, pet denied) (internal quotations omitted).

Likewise, the non-statutory claims asserted by LNY aren't assignable. Its breach-of-contract claim is barred by the anti-assignment clause, as already discussed. The only other non-statutory claim is for breach of the duty of good faith and fair dealing (which LNY also characterizes as a common law bad-faith claim). Dkt 1-2 at 4–5; Dkt 15 at 6–7. But the Texas Supreme Court has prohibited assignment of such claims. For example, in *State Farm Fire & Casualty Co v Gandy*, an insured individual settled with the plaintiff by "agreeing to a judgment in her favor . . . and assigning her any claims he had against [his insurer]." 925 SW2d 696, 697 (Tex 1996). The plaintiff (as the insured's assignee) then brought action against the insurer on a host of claims that included bad faith, along with negligence, gross negligence, breach of contract, and violations of the Texas Insurance Code and the DTPA. Id at 703. The Texas Supreme Court determined that the assignment "violated public policy and therefore conveyed . . . nothing." Id at 698. The court emphasized that it has consistently "invalidated assignments of choses in action that tend to increase and distort litigation." Id at 711. And it reasoned that the assignment at issue did indeed prolong and distort the litigation. Id at 712–13. An intermediate Texas appellate court has since explained, "We are mindful of *State Farm Fire & Casualty Co v Gandy*, where the Supreme Court declared an agreement to assign a bad-faith claim to . . . be violative of public policy." *McGee v McGee*, 936 SW2d 360, 363 n 3 (Tex App—Waco 1996, writ denied).

LNY's petition and all of its arguments necessarily depend upon legal recognition that LNY *itself* has rights and duties under the policy. To the contrary, LNY can't have anything of the sort for the very reason that the policy's anti-assignment clause bars such transfer without the consent of Zurich. See Dkt 14-1 at 42. And there's no dispute that Fertitta Entertainment and Fertitta

17

Hospitality made the putative assignment to LNY without Zurich's consent. This, then, means several things in turn.

*First,* the at-issue assignment is invalid under the plain terms of the policy, at least for purposes of measuring jurisdiction as against Zurich as the non-consenting counterparty to the underlying contract.

*Second,* Fertitta Entertainment, Fertitta Hospitality, and Zurich are the real parties to this controversy.

*Third,* complete diversity exists among the real parties.

*Fourth,* Zurich has met its burden of proving by a "preponderance of the evidence that subject matter jurisdiction exists." *Barrois,* 533 F3d at 327 (citations omitted).

*Fifth,* the motion by LNY to remand must be denied.

*Sixth,* and last, LNY can't proceed further in this action as the plaintiff. That leaves open a question on the procedural path forward. Separate order will issue to entertain briefing on whether this action should be entirely dismissed or whether LNY may (or must) substitute Fertitta Entertainment and Fertitta Hospitality as plaintiffs.

c.   Original understanding of diversity jurisdiction

A final observation is in order. The caseload within the federal courts would be much lightened if only state-law disputes such as this could be off-loaded to state courts having jurisdiction. But the jurisdictional mandates pertinent to Article III power in the United States Constitution aren't some technicality or bothersome hurdle. They're part of the basis of the bargain upon which this nation was formed. What's really at stake here, then, is a federal guarantee of procedural protection that encourages robust national commerce.

Justice Joseph Story summarized the concerns animating the provision of diversity jurisdiction in his *Commentaries on the Constitution of the United States* this way:

> *Nothing can conduce more to general harmony and confidence among all the states, than a consciousness, that controversies are not exclusively to be decided by the state tribunals; but may, at the election of the party, be brought before the national tribunals.* Besides; it

18

cannot escape observation, that the judges in different states hold their offices by a very different tenure. Some hold during good behaviour; some for a term of years; some for a single year; some are irremovable, except upon impeachment; and others may be removed upon address of the legislature. Under such circumstances it cannot but be presumed, that there may arise a course of state policy, or state legislation, exceedingly injurious to the interests of the citizens of other states, both as to real and personal property. It would require an uncommon exercise of candour or credulity to affirm, that in cases of this sort all the state tribunals would be wholly without state prejudice, or state feelings; or, that they would be as earnest in resisting the encroachments of state authority upon the just rights, and interests of the citizens of other states, as a tribunal differently constituted, and wholly independent of state authority. And if justice should be as fairly and as firmly administered in the former, as in the latter, still the mischiefs would be most serious, if the public opinion did not indulge such a belief. *Justice, in cases of this sort, should not only be above all reproach, but above all suspicion.* The sources of state irritations and state jealousies are sufficiently numerous, without leaving open one so copious and constant, as the belief, or the dread of wrong in the administration of state justice. . . . *There is another circumstance of no small importance, as a matter of policy; and that is, the tendency of such a power to increase the confidence and credit between the commercial and agricultural states. No man can be insensible to the value, in promoting credit, of the belief of there being a prompt, efficient, and impartial administration of justice in enforcing contracts.*

Joseph Story, 3 *Commentaries on the Constitution of the United States* § 1685 at 562–64 (Brown, Shattuck and Co 1833) (emphasis added).

Justice Story's observations derived from arguments during the ratification debates themselves. For example, Alexander Hamilton observed in *The Federalist*, no 80:

> [I]n order to the inviolable maintenance of that equality of privileges and immunities to which the citizens of the union will be entitled, the national judiciary ought to preside in all cases in which one state or its citizens are opposed to another state or its citizens. To secure the full effect of so fundamental a provision against all evasion and subterfuge, it is necessary that its construction should be committed to that tribunal, which, having no local attachments, will be likely to be impartial between the different states and their citizens, and which, owing its official existence to the union, will never be likely to feel any bias inauspicious to the principles on which it is founded.

*The Federalist* 537–38 (Wesleyan 1961) (Jacob E. Cooke, ed) (emphasis added). Or as more presciently stated by James Wilson in his important speech in favor of ratification:

> *Is it not an important object to extend our manufactures and our commerce? This cannot be done, unless a proper security is provided for the regular discharge of contracts.* This security cannot be obtained, unless we give the power of deciding upon those contracts to the general government.

James Wilson, Speech at the Pennsylvania State Ratifying Convention (Dec 7, 1787), as published in 4 *The Founders' Constitution* 230 (Philip B. Kurland & Ralph Lerner, eds, 1987) (emphasis added).

And so the newly formed states bound themselves more closely together, each relying on the fact that their own citizens couldn't involuntarily be hauled before the courts of any of their state counterparts. Article III courts are thus obligated to hear

disputes between citizens of different states when the parties are completely diverse. See originally *Strawbridge v Curtiss*, 7 US 267 (1806). This procedural guarantee to out-of-state defendants has allowed commerce to flourish and thrive across state lines in this country (and indeed, internationally) because enterprises of all sizes can enter into contracts and transact business far and wide, confident in the knowledge that disputes will be resolved in a forum that is neutral at least in the sense of being federal and unaligned with, or within the power of, any particular state.

This isn't meant in any way to cast doubt on the competence and integrity of the Texas courts in Harris County to handle insurance disputes like this with an eye towards justice as dictated by the letter of the parties' contract. But that's not the point. The point instead is that diversity jurisdiction can't be effectively amended out of the Federal Constitution by expedient assignment. And that would be the result of LNY's strategy here. To honor the at-issue assignment would effectively permit and encourage such devices to destroy diversity jurisdiction in every commercial dispute involving valid anti-assignment clauses between otherwise completely diverse parties—meaning that any company seeking to be plaintiff in its hometown state court would have that door held wide open.

4. Conclusion

The motion by Plaintiff LNY 5003, LLC to remand this action to Texas state court is DENIED. Dkt 11.

The motion by Defendant Zurich American Insurance Co for leave to conduct jurisdictional discovery is DENIED AS MOOT. Dkt 18.

SO ORDERED.

Signed on September 3, 2021, at Houston, Texas.

Hon. Charles Eskridge
United States District Judge